IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LEONARD W. LANGSTON, SR., | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 22 C 5737 |
| CITY OF CHICAGO, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This case concerns employment discrimination claims filed by Leonard Langston, Sr., an African American man employed with the City of Chicago Department of Water Management (DWM). Langston has sued the City for race discrimination and retaliation. The City has moved for summary judgment.

Langston asserted the following claims for relief in this complaint:

- Hostile work environment and discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5(f)(1) (Count 1); the Illinois Human Rights Act (IHRA), 775 ILCS 5/7A-102(D)(4) (Count 2); 42 U.S.C. § 1981 via 42 U.S.C. § 1983 (Count 3); and the Fourteenth Amendment via 42 U.S.C. § 1983 (Count 4);

- A claim of discrimination under the Illinois Civil Rights Act of 2003 (ICRA), 740 ILCS 23/5(b) (Count 5);

- Retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5(f)(1) (Count 6); IHRA, 775 ILCS 5/7A-102 (D)(4) (Count 7); the ICRA,

740 ILCS 23/5(b) (Count 8); 42 U.S.C. § 1981 via 42 U.S.C. § 1983 (Count 9); and the First and Fourteenth Amendments via 42 U.S.C. § 1983 (Count 10).

After the City of Chicago filed a motion to dismiss, the Court dismissed the hostile environment claims in Counts 1 through 5, the IHRA claims (Counts 2 and 7) in their entirety, and any national origin discrimination claims in Count 1. The Court permitted the remaining claims of discrimination and retaliation to proceed.

As indicated above, the City has now moved for summary judgment on Langston's remaining claims. For the reasons stated below, this Court grants the City's motion.

**Background**

The factual record the Court considers when ruling on a motion for summary judgment is framed by the parties' Local Rule 56.1 statements and responses, although the Court retains discretion to "consider other materials in the record" where appropriate. Fed. R. Civ. P. 56(c)(3). Except as otherwise noted, the following represents the undisputed facts as presented in the parties' L.R. 56.1 statements. The Court notes that Langston has not filed an L.R. 56.1 statement, so the Court has incorporated some of the allegations in Langston's complaint and the record to make the discussion easier to follow.

Langston has been employed by the Department of Water Management since 2004. Since 2012, Langston has been assigned to work at the Jardine Water Purification Plant (JWPP). Operational engineers working at the JWPP are divided into different crews and assignments such as maintenance (training; maintenance, plants and grounds); pump control; chemical transfer; and chlorine. The day-shift group of the

maintenance crew is further divided into crews including the heating, ventilation, and cooling (HVAC) crew; basin crew; boiler room crew; oil crew; and dehumidification crew. At the time of the alleged discrimination, Langston served as an operational engineer in the DWM's maintenance division on the HVAC crew. Previously, from 2012 to 2015, he served on the basin crew.

Langston alleges that three individuals at the DWM discriminated and retaliated against him: assistant chief operating engineers Chris Browne and Joseph Morabito and chief operating engineer Thomas Barrett.

**A.      Involvement in Kathleen Ealy's EEO case**

In January 2017, Langston served as a witness and made a statement in Kathleen Ealy's discrimination case against the DWM. Langston alleges that his participation in his coworker's case caused DWM to discriminate and retaliate against him.

**B.      Alleged denials of overtime**

The JWPP provides two opportunities for overtime: day crew overtime and shift crew overtime. Langston's suit concerns denials of shift crew overtime. The Collective Bargaining Agreement (CBA) between the City of Chicago and International Union of Operating Engineers Local 399 establishes the DWM's procedures related to overtime. *See* Def.'s Ex. 4, Ex. B. Shift crew overtime positions are available to all operational engineers assigned to groups A or C at the JWPP. The JWPP maintains a seniority overtime list to assign shift crew overtime positions as they arise. As outlined in section 5.2, the CBA permits supervisors to consider seniority and the employee's "present ability to perform the work" when assigning overtime positions. *Id.* The CBA also

mandates that employees who have been given the opportunity to work overtime should not be given overtime again until all employees in the classification at the work location have also been given the opportunity. *Id.*

On April 4, 2019, Langston asked Thomas Barrett, the chief operating engineer at the DWM since 2016, to add him to the overtime list for the pump control crew. In May 2019, Barrett promised Langston that he would be added to that list. The parties dispute the sequence of events that followed after these initial communications. Based on a series of emails starting from April 18, 2019, Langston emailed Barrett multiple times to ask about his placement on the overtime list. Based on the information the Court has garnered from these emails, Langston alleges that he was deliberately skipped for pump control crew overtime on four occasions, including July 8, 2019, August 17, 2019, and October 18, 2019 (Langston does not provide the fourth date). The defense states that Langston also alleges he lost "extra" overtime opportunities to install fish grates in June 2019 and 2020, but these dates are difficult to identify, as Langston has not provided them in his brief or supporting materials.

The City contends that it added Langston to the overtime list after his request but that he initially did not receive any overtime opportunities because none were available between the time of his initial request and July 2019. Langston does not dispute that he was added to the pump control crew overtime list by July 2019 but disputes the City's contention that there were no opportunities available before that.

In response to Langston's claim that he was skipped for overtime on August 17, 2019, the City says the denial occurred because of procedural requirements: Langston had worked an overtime shift a few days prior, on August 15, 2019. Langston admits

4

this.

Langston further contends that two white employees, who were also operational engineers, were given more overtime opportunities than him. Langston says he became aware of this in April 2019. The other employees were Mike Gainer, who served as an operating engineer assigned to the chemical transfer crew, and John Robinson, who was assigned to the Chief's Office, which is a special assignment that is not part of any of the operational engineer crews at JWPP.

Langston complained to Barrett about his concerns of discrimination and unequal treatment multiple times via email throughout 2019 and 2020.

**C.     Alleged incidents of retaliation**

Around June 7, 2020,[1] Langston discovered what the parties refer to as a "hurt feelings report" near his workstation. It is undisputed that Joseph Morabito was initially in possession of this document. The City contends that Morabito intended the document for another employee, not Langston. The parties dispute the contents of the hurt feelings report, or at least its tenor. The City contends that it did not mention race or anything about discrimination; Langston contends that it made condescending accusations about people who complained of unequal treatment.

In June 2022, Langston applied for a promotion to the position of chief operating engineer. He asked chief operating engineer Barrett to recuse himself from the interview. The DWM, after performing an internal assessment, denied Langston's request. Ultimately, Langston did not receive the promotion. The individual who

---

[1] Langston's complaint lists the date as July 20, 2020. In its Local Rule 56.1 statement, however, the City states that the date that Langston saw the hurt feelings report was June 7, 2020. Langston concedes this in his response.

5

received the promotion, Steve Wilson, is also African-American, and he held a higher position than Langston at the time.

**D.     EEOC charge**

On or around April 20, 2021, Langston filed a charge of discrimination with the Illinois Department of Human Rights (IDHR), which was cross-filed with the Equal Employment Opportunity Commission (EEOC).  In this complaint, he alleged discrimination and harassment based on race and sex and sought relief for denial of overtime hours, harassment, and retaliation.  He listed August 30, 2020 as the latest date that he suffered discrimination at the hands of the DWM.

The EEOC denied Langston's complaint and sent him a right-to-sue letter on June 8, 2022.  On July 18, 2022, Langston downloaded the right-to-sue letter from an EEOC portal.  When seeking guidance from his EEOC advisor about the deadline for filing a lawsuit, the EEOC advisor incorrectly told him that he had until October 18, 2022 to file his complaint in the federal court.

Accordingly, Langston filed his complaint in the present case on October 18, 2022.

## Discussion

The City of Chicago has moved for summary judgment.  Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears

6

the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party is then required to identify material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). But when a litigant fails to respond to an argument, the litigant effectively forfeits the point and concedes the opposing party's contention. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

This Court first considers Langston's claims regarding discrimination (counts 1, 3, 4, 5) and then moves to the claims regarding retaliation (counts 6, 8, 9, 10).

**A.     Claims of discrimination**

**1.     ICRA claim (count 5)**

Langston contends that the DWM engaged in discrimination that violates the ICRA. In response, the City argues that the ICRA does not apply because it was patterned on Title VI of the Civil Rights Act of 1964 and thus requires proving additional elements that Langston cannot satisfy. Langston argues in response that the two statutes are separate pieces of legislation with different requirements. But he provides no legal support to advance this contention.

The Court agrees with the City. The ICRA was modeled after Title VI of the Civil Rights Act of 1964. *Edmond v. City of Chicago*, No. 17 C 4858, 2024 WL 1603464, at *10 (N.D. Ill. Apr. 11, 2024) (Kennelly, J.); *Livingston v. City of Chicago*, No. 16 C 10156, 2024 WL 245214, at *6 (N.D. Ill. Jan. 22, 2024); *Cary v. Ne. Ill. Reg'l Commuter R.R.*

7

*Corp.*, No. 19 C 03014, 2020 WL 1330654, at *4 (N.D. Ill. Mar. 22, 2020); *Dunnet Bay Constr. Co. v. Hannig*, No. 10-3051, 2014 WL 552213, at *24 (C.D. Ill. Feb. 12, 2014), *aff'd sub nom. Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676 (7th Cir. 2015) ("Section 5 of the Illinois Civil Rights Act of 2003, which prohibits discrimination against a person in a government program based on race and other classifications, *see* 740 ILCS 23/5, was not intended to create new rights but was instead enacted to establish a state law remedy for discrimination that was covered by Title VI."). "[B]ecause the [ICRA] is patterned after Title VI of the Civil Rights Act of 1964, courts look to federal civil-rights statutes to guide the interpretation of the [ICRA]." *Livingston*, No. 16 C 10156, 2024 WL 245214, at *6.

For this reason, a litigant seeking relief for discrimination under the ICRA against a governmental entity must meet the requirements for a Title VI claim, which in this circuit comes from *Ahern v. Board of Education of City of Chicago*, 133 F.3d 975, 978 (7th Cir. 1998). Under the *Ahern* test, to sustain a claim that a government entity that receives federal funding under Title VI engaged in employment discrimination, a plaintiff must establish that "(1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." *Edmond*, No. 17 C 4858, 2024 WL 1603464, at *10 (explaining how to satisfy the *Ahern* test in the context of Title VII discrimination claims).

Langston does not address the elements of the *Ahern* test as applied to his case, and consequently he has effectively forfeited any argument that he can satisfy that test. As it did in *Edmond*, the Court concludes that Langston cannot maintain a claim under

8

the ICRA.

### 2. Section 1981 and Fourteenth Amendment via section 1983 claims (counts 3 and 4)

Langston contends that the City's denial of his overtime requests constituted discrimination in violation of 42 U.S.C. § 1981 (Count 3) and the Equal Protection Clause of the Fourteenth Amendment (Count 4). Edmond asserts both of these claims via 42 U.S.C. § 1983. Section 1983 enables an employee of a local governmental agency to sue those individuals who are personally responsible for the deprivation of the employee's constitutional rights. *Gamble v. Cnty. of Cook*, 106 F.4th 622, 625 (7th Cir. 2024). "The same legal standard applies to claims of racial discrimination under Title VII, Sections 1981 and 1983 . . . ." *Id.* at 625.

When, as in this case, a litigant sues a local governmental entity under section 1983, it must "prove that the constitutional violation was caused by a governmental 'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)). In *Speigel,* the Seventh Circuit explained:

> We have interpreted this language to include three types of actions that can support municipal liability under § 1983: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

916 F.3d at 617 (quotation marks omitted).

Langston attempts to briefly address the elements of *Monell* in his response brief and in his complaint. He alleges a "culture of discrimination, which was widespread,

9

prevalent and well known at the DWM" and argues that the City failed to act because "[e]ven after its repeated claims of racial discrimination at the DWM, they failed to take any substantive acts to correct the atmosphere to prevent Plaintiff from being discriminated against and harassed." Langston Resp. Br. at 14. But Langston musters no evidence to support these allegations. His conclusory contentions are insufficient to avoid summary judgment. *See Aberman v. J. Abouchar & Sons, Inc.*, 160 F.3d 1148, 1150 (7th Cir. 1998) (stating that "in the absence of supporting evidence '[c]onclusory allegations by the party opposing [a summary judgment] motion cannot defeat the motion.'"). The City is entitled to summary judgment on these claims.

### 3. Title VII discrimination claim (count 1)

Langston asserts race-based discrimination under Title VII. In his EEOC complaint, Langston claimed he was discriminated against when he was denied overtime shifts on multiple occasions.

Title VII requires a litigant claiming employment discrimination to file his charge with the EEOC within 300 days of the alleged unlawful discrimination. *See* 42 U.S.C. § 2000e-5(e)(1); *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1846 (2019). The City argues that Langston's Title VII claims are untimely because he did not file his EEOC charge within the 300-day period. In his response brief, Langston fails to respond to this contention. And he offers nothing to show that he did file his EEOC charge within 300 days of the City's last allegedly discriminatory act. In fact, there is no mention of the 300-day rule at all in Langston's response brief. In short, Langston has effectively conceded the City's argument that he failed to timely file his EEOC charge. *See Bonte*, 624 F.3d at 466.

10

Langston filed his charge with the EEOC on April 20, 2021. Def.'s Ex. 1. Thus, for his charge to be timely, the last discriminatory action had to have occurred no more than 300 days before April 20, 2021. In his EEOC charge, Langston alleged that the last date of discrimination was August 30, 2020, which, if so, would make the charge timely. But on summary judgment, Langston points to no evidence indicating that he was denied overtime in that date. Indeed, despite the City having clearly asserted a timeliness issue regarding the EEOC charge, Langston does not even attempt to identify any specific days when he was denied overtime within the 300 days before his EEOC filing, let alone provide any evidence. The allegations in his EEOC charge are not good enough; the charge is not evidence. And the Court could not find in the record any evidence of overtime denials within the 300-day period. *See* Pl.'s Ex. 1; Def.'s Ex. 3. Nor has Langston asserted any basis for tolling of the statutory period.

For this reason, the City is entitled to summary judgment on Langston's Title VII discrimination claim (Count 1).

## B. Retaliation claims (counts 6, 8, 9, 10)

Langston asserts retaliation claims under the ICRA, Title VII, the Fourteenth Amendment, the First Amendment, and 42 U.S.C. § 1981, the latter three claims all asserted vis 42 U.S.C. § 1983. He alleges that the DWM retaliated against him for three actions on his part: (1) acting as a witness in a fellow DWM employee Kathleen Ealy's discrimination case in January 2017; (2) complaining about discrimination to Barrett on multiple occasions via email between April 2019 and July 2020;[2] and (3) filing

---

[2] The Court notes that it is unclear from Langston's complaint whether he is specifically alleging retaliation based on the emails he sent to Barrett about his concerns of discrimination. But because Langston has included this in the introduction section of his

11

his EEOC/IDHR charges in April 2021. The alleged retaliation claimed by Langston consisted of: (a) his supervisors' failure to publicly post the overtime list and denial of overtime opportunities in 2019; (b) Morabito's placement of a document called the "hurt feelings report" at Langston's workstation in July 2020; and (c) Barrett's failure to recuse himself from Langston's promotion interview, and Langston's non-receipt of the promotion, in June 2022.

### 1. ICRA claim (count 8)

For the same reasons stated in section A.1 of this opinion, Langston's ICRA retaliation claim fails.

### 2. Fourteenth Amendment via section 1983 (count 10)

Langston asserts a retaliation claim under the Fourteenth Amendment's Equal Protection Clause. As the City correctly argues, however, the Fourteenth Amendment does not establish a "general right to be free from retaliation." *See Grossbaum v. Indianapolis–Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1296 n.8 (7th Cir. 1996); *see also Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989); *Boyd v. Illinois State Police*, 384 F.3d 888, 898 (7th Cir. 2004). A litigant therefore cannot assert a claim of retaliation under the Fourteenth Amendment. The City is entitled to summary judgment on the equal protection claim contained within Count 10.

### 3. First Amendment via section 1983 (count 10)

Langston contends that "he was retaliated against not just because he filed charges of discrimination with the IDHR and EEOC, but because he made statements to [the] EEO [in] support of [Kathleen] Ealy." Langston Resp. Br. at 12. He contends

---

complaint, this Court incorporates it here.

12

that these acts were protected speech and therefore claims retaliation in violation of his rights under the First Amendment.

To sustain a First Amendment retaliation claim, Langston is required to prove that he "(1) engaged in activity protected by the First Amendment, (2) suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was a 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008); *see also Gnutek v. Illinois Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023); *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

For a public employee's speech to be protected, it must address a matter of public concern. *See, e.g., Carreon v. Ill. Dep't of Hum. Servs.*, 395 F.3d 786, 791 (7th Cir. 2005). Langston offers no explanation of how his statement made in connection with Ealy's case or his own grievances involved matters of public concerns. That aside, the law is clear that employee grievances—or, by extension, statements made in support of other employees' grievances—are not constitutionally protected matters of public concern. *See Ceballos*, 547 U.S. at 420 ("Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'"); *see also Connick v. Myers*, 461 U.S. 138, 154 (1983).

For this reason, the City is entitled to summary judgement on the First Amendment claim contained in count 10.

### 4. Title VII (count 6) and section 1981 via section 1983 (count 9)

Langston next claims retaliation under section 1981 via section 1983 and Title

13

VII. To survive summary judgment on these claims, under the direct method of proving retaliation, Langston must show that there was "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022) (internal quotation marks and citation omitted) (indicating that the test for proving retaliation claims under section 1981 and Title VII is the same). This Court need not address the first and second elements, because Langston falls short on the third.

As the City argues, Langston has not pointed to evidence that would permit a reasonable jury to find that any of the three retaliatory events he identifies occurred *because of* his participation in Ealy's case or his assertion of discrimination claims. *See Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023). In fact, in his response brief, Langston does not even attempt to respond to the City's argument and identify evidence indicating that these events are causally connected. He has thus forfeited the point. Forfeiture aside, however, Langston would fail on the merits in any event, for the reasons the Court will now discuss.

        a.        **Retaliation for participation in Ealy's case**

No reasonable jury could find that the City retaliated against Langston because he provided a statement in Ealy's EEO case. *Haywood v. Lucent Technologies, Inc.* is analogous to this case. Langston gave his statement in Ealy's case in January 2017; the earliest claimed act of retaliation, involving denial of overtime, took place in July 2019. That is too long an interval to give rise to a reasonable inference of retaliatory motive, absent something more—and here, the "more" is missing. *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531–32 (7th Cir. 2003) (finding no causal link

14

because claimed retaliation took place a year after the protected activity). The same is true of the other allegedly retaliatory incidents, which took place *after* the overtime denials and thus are even more separated in time from Langston's protected activity.

In addition, Langston has offered no evidence that would permit a reasonable jury to find that Barrett, Morabito, or Browne knew about his participation in Ealy's case. Langston testified during his deposition that he believed that an individual who overheard his conversation about Ealy's case mentioned it to Barrett, Morabito, and Browne and that "if I'm not mistaken, Tom Barrett was the one who told me I had to go [to Ealy's case]." *See* Def.'s Ex. 3 at 85:10–19, 83:7–17. This is insufficiently concrete to permit a reasonable evidence of the alleged retaliators' knowledge of Langston's protected activity.

### b. Retaliation for discrimination filings and internal complaint emails

Similarly, Langston has not pointed to evidence that would permit a reasonable jury to find a causal connection between the claimed retaliatory acts and his complaints of discrimination to the EEOC and IDHR or his internal emails to Barrett complaining of discrimination (assuming Langston is claiming retaliation for those emails, which is unclear).

First of all, the overtime denials occurred before Langston filed his EEOC/IDHR charges in April 2021, so these denials cannot logically have been in retaliation for protected activity that had not yet taken place. And although the overtime denials occurred after and contemporaneously with Langston's emails complaining to Barrett, Langston has not pointed to any evidence that would permit a finding that Barrett denied Langston overtime *because* he complained about potential discrimination.

15

By contrast, Barrett's refusal to recuse himself from Langston's promotional interview and the denial of the promotion took place after Langston complained to Barrett and filed the EEOC and IDHR charges in April 2021. But again, the interval between these protected activities and the claimed retaliatory events, which took place in June 2022, is too long to permit a reasonable inference of causation without other evidence supporting such an inference, which Langston does not identify. *See Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (explaining that in a retaliation claim courts "consider the evidence as a whole and conduct a straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [materially adverse action]?") (internal quotation marks omitted).

This leaves the so-called "hurt feelings report," a document placed at Langston's workstation in July 2020 that—as he describes it—indicated that a person who complains of unfair or unequal treatment is a "whiner" or a "sissy" and made other inappropriate and juvenile comments along the same lines. To begin with, Langston received this report before he filed his EEOC/IDHR charges in April 2021, so this event cannot logically be retaliation for his formal filings.

Langston also appears to contend that the "hurt feelings report" was delivered to him as retaliation for his internal complaints to Barrett about denial of overtime and perhaps other related issues. *See* Langston Resp. Br. at 5. In its motion for summary judgment, the City argues that the receipt of this report does not qualify as "adverse action" giving rise to a viable retaliation claim. *See* City's Opening Br. at 19-20. Langston does not address this point in his summary judgment response and thus has

effectively conceded it. Even without the concession, however, the claim would fail. Though the document was offensive, it does not clear the adverse action threshold. To be actionable, retaliatory action must be something that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Abebe*, 35 F.4th at 607 (internal quotation marks and citation omitted). The "hurt feelings report" plainly did not have that effect: Langston filed his EEOC/IDHR charges after receiving the report. And if "[u]nfair reprimands or negative performance review, unaccompanied by tangible job consequences" do not qualify as actionable retaliation, *see Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016), then neither does a single critical memo that does not suggest any other adverse consequences. For these reasons, the City is entitled to summary judgment on Langston's section 1981 retaliation claim (Count 9).

## Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment [dkt. no. 53] in its entirety. The Clerk is directed to enter judgment stating: This case is dismissed with prejudice.

Date: December 13, 2025

_____
MATTHEW F. KENNELLY
United States District Judge